**MATRIX MOTOR CO., INC., Plaintiff,**

v.

**TOYOTA JIDOSHA KABUSHIKI KAI-SHA t/a Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor North America, Inc., Defendants.**

No. CV 03–0601 CJC(JTLX).

United States District Court,
C.D. California,
Southern Division.

June 30, 2003.

**1084**

Mitchell N. Reinis, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, David H. Greenberg, David H. Greenberg Law Offices, Beverly Hills, CA, Irwin M. Friedman, Irwin M. Friedman Law Offices, Gardena, CA, for Plaintiff.

Donald L. Ridge, Morris, Polich & Purdy, Los Angeles, CA, John F. Hornick, Margaret A. Esquenet, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, Jennifer Adams Draffen, Finnegan, Henderson, Farabow, Garrett & Dunner, Palo Alto, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND FOR ENTRY OF JUDGMENT

CARNEY, District Judge.

## I. PROCEDURAL BACKGROUND

On April 29, 2002, Matrix Motor Co., Inc. ("MMC") filed this action against defendants Toyota Jidoshi [sic] Kabushiki Kaisha t/a Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor North America, Inc. ("Toyota"), alleging (1) false designation of origin under Section 43(a) of the Lanham Act; (2) unfair competition at common law and in violation of Section 17200 of the California Business and Professions Code; (3) infringement of common law trademark; and (4) infringement of State of California trademark. MMC accuses Toyota of infringing its alleged rights in the name MATRIX through Toyota's use of the term TOYOTA MATRIX on passenger cars.

On April 15, 2003, Toyota moved for summary judgment pursuant to Fed. R.Civ.P. 56 on all of MMC's claims. For the reasons discussed below, Toyota's motion is granted.[1]

---

1. At the time this motion is granted, Defendants have the following motions pending before this Court: (1) Ex Parte Application to Specially Set Defendants' Motion for Additional Discovery, and Defendants' Discrepancy Motion for Limited Additional Discovery Pursuant to Fed.R.Civ.P. 16 and This Court's March 13, 2003 Order; (2) Defendants' Emergency Ex Parte Application for Confidential Protective Order Pursuant to Fed. R.Civ.P. 26(c)(7); (3) Defendants' Motion to Strike/Exclude Plaintiff's Expert Reports and Testimony, or in the Alternative to Modify the Scheduling Order for Good Cause Under Fed.R.Civ.P. 16; (4) Ex Parte Application to Specially Set Defendants' Motion to Strike/Exclude Plaintiff's Expert Reports and Testimony, or in the Alternative to Modify the Scheduling Order for Good Cause Under Fed.R.Civ.P. 16; and (5) Defendants' Ex Parte Application to Specially Set Defendants' Motion for Summary Judgment, or in the Alternative to Set the Hearing on a Date After the Pretrial Scheduling Order Motion Hearing Cutoff.

In view of the disposition of Defendants' summary judgment motion, the Court need not address such pending motions, which are now moot.

## II. FACTUAL BACKGROUND

### A. MMC's Business and Use of MATRIX

MMC is a California corporation that manufactures highly specialized racing cars and parts. MMC's racing cars are custom-made, and sell for about $375,000 to $450,000. (Deposition of Louis Beuzieron at p. 50–52 ("Beuzieron Depo.")). Not only are MMC's race cars extremely expensive, but they must meet exacting standards established by the governing bodies of the races in which MMC's customers compete. (*Id.* at 51, 153, and 159–60).

To the extent that MMC uses the mark "MATRIX", it is never used alone; instead, it is always accompanied by an "M" logo. (*See* Deposition of Klara Kovacs at 32–33 ("Kovacs Depo.")). Furthermore, MMC has never sold a race car bearing the MATRIX mark in the United States.[2] (MMC's 30(b)(6) Depo. at 20–22). At best, MMC's evidence suggests that it may have sold three racing vehicles in California that had transmission or other vehicle parts bearing the MATRIX mark. Moreover, MMC has provided no evidence that it advertises its cars in the U.S. (Beuzieron Depo. at 81; MMC's 30(b)(6) Deposition, at p. 97–98). Finally, MMC does not offer its cars to the same class of purchasers who buy TOYOTA MATRIX vehicles. (Beuzieron Depo. at 133).

Though MMC's brief opposing Toyota's summary judgment motion speaks of its "hopes and dreams" of producing an expensive passenger car to compete with Ferrari and Lamborghini, MMC has provided no evidence that these hopes and dreams are likely to come to fruition. The undisputed evidence shows that although

MMC has, for the past ten years, dreamed of producing a high-end street-legal vehicle (Beuzieron Depo., at 26–34, 53), MMC has never brought any such car to market. MMC has no buyers or investors for such a car, none of the government approvals needed for such a car, or even a car it could show to potential customers. (*Id.*) Even if such a prestige vehicle were to exist, MMC's deposition testimony shows that it would have an entirely different market from the TOYOTA MATRIX vehicle, and that its potential customers would not confuse its car with Defendants' vehicle. (Beuzieron Depo., at 59–62).

### B. Toyota's Use of the Matrix Mark

In January 2002, Defendants launched the TOYOTA MATRIX, a compact, economy passenger vehicle priced from around $15,000 to $20,000. (Declaration of Ryan Miller at ¶¶ 2, 4 ("Miller Decl.")). Geared toward a younger audience, the TOYOTA MATRIX has been advertised and promoted at rock concerts, sporting events, and on the Internet, as well as through traditional media, including television and magazines. (*Id.* at 6, 7). Defendants use the term MATRIX in connection with their well-known TOYOTA housemark. (Expert Report of Robert Mudd at p. 5 ("Mudd Report"); Miller Decl. at ¶ 3). Like most passenger vehicles, the TOYOTA MATRIX is not sold directly to the public, but through a network of dealerships. (Mudd Report at 5–6). Defendants do not market race cars under the TOYOTA MATRIX mark, nor do they intend to do so in the future. (Miller Decl. at ¶ 8). In response to the teenage tradition of tuning or "souping up" vehicles, Defendants did present a "rally race car" concept car at the 2001

---

2. MMC obtained a California State trademark registration for the MATRIX & Design mark, covering "cars, engines, and transmissions," which registered in December 2000 (*see* California State Trademark Registration No. 106881). As discussed later in this opinion, MMC has failed to show that it ever made the requisite use of the MATRIX & Design mark needed to acquire this state registration.

New York Auto Show. (*See* Declaration of John Hanson in Support of Defendants' Motion for Summary Judgment, ¶ 4 ("Hanson Decl.")). This one-of-a-kind prototype was designed to illustrate the aftermarket capabilities of the TOYOTA MATRIX. This car, however, had no racing capability, and in fact was largely inoperable. (*Id.*) Further, Toyota Racing Development, U.S.A., Inc. ("TRD"), a nonparty subsidiary of Defendant Toyota Motor Sales, U.S.A., Inc., manufactures aftermarket parts designed to enhance the street performance of the TOYOTA MATRIX. (*See* Declaration of Jim Aust in Support of Defendants' Motion for Summary Judgment, ¶ 4 ("Aust Decl.")). Neither TRD nor any of the Defendants are involved in racing the TOYOTA MATRIX, nor do they make, advertise, or sell racing parts or accessories for the TOYOTA MATRIX. (*Id.* at ¶ 3). MMC has presented no evidence to the contrary.

Defendant Toyota Motor Corporation filed an application to register the term MATRIX with the U.S. Patent and Trademark Office ("PTO"). Though the PTO initially refused registration, the mark has now been approved. (*See* Declaration of Jennifer Adams Draffen in Support of Defendants' Reply to MMC's Opposition to Defendants' Motion for Summary Judgment, ¶ 3, Exhibit 2 ("Draffen Decl.")).

Long before launching its vehicle in February 2002, Defendants commissioned a comprehensive search report in July 2000, showing the use of the term MATRIX in the automotive industry. (Declaration of Laura Lang, ¶ 2 ("Lang Declaration")). MMC did not appear in the search report, nor was anyone involved in Defendants' selection process aware of MMC. (*Id.*). Though MMC alleges that a low level employee of one of Defendants' subsidiaries was aware of MMC's existence, MMC does not dispute the fact that this employee was in no way involved in Defendants' selection of the MATRIX mark. (Beuzieron Depo., p. 144–45). Upon learning of Defendants' planned launch of the TOYOTA MATRIX, MMC's attorney sent Defendants a cease-and-desist letter on September 17, 2001. Defendants did not believe there was any likelihood of confusion with MMC's alleged race cars and began to use the mark a few months later. (Lang Declaration, at ¶ 4). The present action followed.

MMC argues that Defendants' use of the term MATRIX in connection with its TOYOTA MATRIX vehicle is likely to cause confusion, and that Toyota's use has in fact caused confusion with MMC's use of its MATRIX mark. MMC's evidence in support of this claim, however, is virtually nonexistent and does not support its arguments. The evidence of actual confusion offered by MMC consists of unsubstantiated phone inquiries and an allegedly scuttled business deal. (Beuzieron Depo., p. 83–90). However, MMC presents no evidence that anyone was actually confused. In further support of its claims, MMC has submitted the expert opinions of Harry D. Hibler and Drino Miller (collectively, "MMC's Expert Reports"). However, MMC's Expert Reports do not raise any issues of material fact. Instead, they merely recite hearsay statements, often verbatim, culled from a variety of Internet websites. (*See* MMC's Expert Reports; *see also* Declaration of E. Patricia Hart ("Hart Declaration")). Devoid of any factual basis or foundation, MMC's Expert Reports are irrelevant.

## III. STANDARD GOVERNING SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate in circumstances where "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Id.* at 327, 106 S.Ct. 2548; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

MMC, the summary judgment opponent, has the burden of proof at trial because it is alleging trademark infringement and unfair competition. *Nissan Motor Co. v. Nissan Computer Corp.*, 204 F.R.D. 460, 466 (C.D.Cal.2001). Because MMC has the burden of proof at trial, Toyota has no burden to negate MMC's claims. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. When the moving party does not have the ultimate burden of proof at trial, it need not produce evidence showing the absence of a genuine issue of material of fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an **absence of evidence to support the nonmoving party's case.**" *Sony Pictures Entm't, Inc. v. Fireworks Entm't Group, Inc.*, 156 F.Supp.2d 1148, 1152 (C.D.Cal. 2001) (emphasis added) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). Furthermore, "[o]nce the moving party satisfies this initial burden, 'an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings.... The adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial.'" *Sony Pictures Entm't*, 156 F.Supp.2d at 1152 (quoting Fed.R.Civ.P. 56(e)). In *Sony*, this Court ruled that

A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Sony Pictures Entm't.*, 156 F.Supp.2d at 1152–53.

Further, while this Court has acknowledged that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant," it is also important to note that "the court must view the evidence presented ... 'through the prism of the substantive evidentiary burden.'" *Id.* at 1153 (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). Moreover, a "plausible scenario cannot counter direct evidence offered in support of a motion for summary judgment." *Swanson v. Leggett & Platt*, 154 F.3d 730, 733 (7th Cir.1998); *see also O.J. of Stillwater, Inc. v. Visiontrade AG*, No. 99–6270, 2000 WL 1763458, at *3 (10th Cir. Nov.30, 2000) (to defeat a motion for summary judgment, "[m]ere speculation of plausible alternative scenarios will not suffice").

## IV. LEGAL ANALYSIS

MMC and Toyota agree that MMC's claims are all guided by the same legal analysis, and therefore MMC's claims are discussed together for purposes of this opinion under the rubric of MMC's trademark infringement claim. *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 n. 3 (9th Cir.2002); *PepsiCo, Inc. v. Reyes*, 70 F.Supp.2d 1057, 1059 (C.D.Cal. 1999).

### A. MMC's Alleged Rights in Matrix for Automobiles

■ To prevail on a claim for trademark infringement, a plaintiff must first establish that it owns a valid trademark. *Japan Telecom, Inc. v. Japan Telecom Am.*, 287 F.3d 866, 872 (9th Cir.2002). Trademark ownership is not acquired by federal or state registration. *Sengoku Works Ltd. v. RMC Int'l*, 96 F.3d 1217, 1219–20 (9th Cir.1996); *Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 119 F.Supp.2d 1083, 1089 (C.D.Cal.2000). Ownership rights flow only from prior use in the market. *Sengoku Works Ltd.*, 96 F.3d at 1219–20; *Pacific Supply Co-op. v. Farmers Union Central Exchange*, 318 F.2d 894, 905 (9th Cir.1963).

■ The use necessary to acquire protectable rights is more than token or *de minimus* use. *See Chance v. Pac–Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001). The use of the mark must be "sufficiently public" that the marked goods are "identified or distinguish[ed] . . . in an appropriate segment of the public mind as those of [the adopter of the mark]." *Glow Indus., Inc. v. Lopez*, 252 F.Supp.2d 962, 981 (C.D.Cal.2002).

As explained below, MMC has not shown that it has U.S. trademark rights in the MATRIX mark for cars or related components or parts. MMC has admitted that it has not used the MATRIX mark on vehicles in the United States, and has failed to offer any corroborating evidence supporting its claim that it uses the mark on vehicle components or parts.

### 1. Plaintiff's Nonuse of the MATRIX Mark

■ MMC has submitted no evidence that it actually ever used the MATRIX mark in connection with the sale of a race car in California or anywhere else in the United States.[3] MMC also admitted that it has not used the mark on any vehicles sold in the United States. (MMC's Depo. at 20–22).[4] Although MMC claims that it has sold vehicles that had transmission or other vehicle parts bearing the MATRIX mark, MMC has provided no corroborating evidence of such use.[5] Thus, Plaintiff has not met its burden with respect to the threshold prong of the trademark infringement analysis.

### 2. MMC's California State Trademark Registration

MMC obtained California State Trademark Registration No. 106881, which registered on December 5, 2000 and covers "cars, engines, transmissions." Section 14230 of the California Business & Profes-

3. Although MMC claims token sales of its vehicles in Europe, sales of a product bearing a trademark in Europe are insufficient to establish rights in the United States. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26:5 (West 2003); *Grupo Gigante*, 119 F.Supp.2d at 1089. Thus, MMC's alleged use of the mark MATRIX in connection with the sale of vehicles outside of the United States, does not establish trademark rights in California or the United States. *Grupo Gigante*, 119 F.Supp.2d at 1089.

4. In MMC's Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment, at 2–4, and 18 ("MMC's Op-

position Brief"), MMC also stated twice that it "began doing business under the name MATRIX . . . in 1995 and continuously used the Matrix name through and including **2000** . . ." (MMC's Opposition Brief, at pp. 2 and 16) (emphasis added). Thus, MMC apparently stopped using the MATRIX mark in the year 2000, which was before the Toyota Defendants started.

5. MMC has only provided information indicating that it has sold crew shirts bearing the MATRIX & Design mark on the inside collar tag. *See* Deposition Transcript of Fuat Tamturk, at p. 18–19 ("Tamturk Depo.").

sional Code provides that "any person who adopts and *uses a mark in this state*" may file a trademark application with the Secretary of State, covering the "goods or services in connection with which the *mark is used*" (emphasis added). Additionally, Cal. Bus. & Prof.Code § 14209 defines "use" with respect to goods as when the mark "is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and such goods are sold or otherwise distributed in the state." A California certificate of trademark registration is *"prima facie* evidence of ownership of such mark as applied to the goods or services therein identified in the State of California." Cal. Bus. & Prof.Code § 14241. The presumption of validity accompanying a California trademark registration can be rebutted if the trademark did not meet the registration requirements. *Builders Square, Inc. v. Wickes Cos.*, 227 U.S.P.Q. 644, 649 n. 4 (C.D.Cal. Sept.4, 1985); *Grupo Gigante,* 119 F.Supp.2d at 1088.

In light of MMC's failure to present sufficient evidence of use of the MATRIX mark for the goods covered by its California registration, as well as its admission that it has not used the mark on cars, MMC could not have satisfied the "use in California" prerequisite for obtaining its state registration pursuant to Cal. Bus. & Prof.Code § 14209 (2003). Thus, any ownership presumption afforded by the California state registration is rebutted here.

### 3. MMC's Business Goals and Dreams

In its Opposition Brief, MMC spoke at length about its future goals and dreams of

producing an expensive street-legal passenger car. (MMC's Opposition Brief, at 2–4). However, none of these future goals and dreams constitute any evidence of actual use of the MATRIX mark in connection with vehicles.

Trademark rights are not established by goals and dreams. They are established only through prior use of the mark in the marketplace. *Sengoku Works,* 96 F.3d at 1219–20; *see also Pacific Supply Co-op.,* 318 F.2d at 905. As stated by the Ninth Circuit in *Sengoku Works:*

> It is axiomatic in trademark law that the standard test of ownership is priority of use. **To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.**

96 F.3d at 1219 (emphasis added).

While MMC may dream, for example, of someday selling a Ferrari-like or DeLorean-like street car, MMC presents no evidence that such a car really exists in any form. Moreover, MMC admitted that it has never sold a passenger vehicle, that it has no investors or buyers for its dream car, and that it has no government approvals for such a car.[6] Thus, MMC's goals and dreams of selling a high-end passenger car do not demonstrate evidence of valid trademark rights in the MATRIX mark.

### B. Likelihood of Confusion Analysis

Even assuming MMC had valid trademark rights in the MATRIX mark, it still has not met its burden of showing a likelihood of confusion. The test for trade-

---

**6.** MMC's response to Defendants' contention no. 9 in Plaintiff's Statement of Genuine Issues in Opposition to Motion for Summary Judgment ("Plaintiff's Statement of Genuine Issues"); Defendants' Reply to MMC's Opposition to Motion for Summary Judgment, Draffen Declaration, ¶¶ 2(i), 2(s), and 2(t) ("Toyota's Reply Brief"); and Beuzieron Depo. at pp. 26–34, 53.

mark infringement is governed here by Section 43(a) of the Lanham Act, which prohibits use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a) (1999).[7] Actionable confusion for purposes of a trademark infringement analysis must be "probable, not simply a possibility." *Murray v. Cable NBC Co.*, 86 F.3d 858, 861 (9th Cir.1996).

The Ninth Circuit uses a multi-factor test to determine whether there is a likelihood of confusion between the use of the two marks. The relevant factors include: (1) the strength of the mark, (2) the similarity of the marks, (3) the parties' respective marketing channels, (4) the proximity of the parties' respective goods, (5) the type of goods and the degree of care likely to be exercised by the relevant purchaser, (6) intent in selecting the mark, (7) evidence of actual confusion, and (8) the likelihood of expansion of the parties' product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979).

In so-called "reverse confusion" cases, like the one here, "[t]he question ... is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir.1998). This Court has held that three of the *Sleekcraft* factors are particularly important in determining whether reverse confusion has occurred. *Glow Indus.*, 252 F.Supp.2d at 986. These factors are: (1) the strength or arbitrariness of the mark; (2) the relatedness (or proximity) of the parties' goods;

and (3) the similarity of the marks. *Id.* These factors are discussed below in more detail. Contrary to MMC's argument, the Court's consideration of MMC's reverse confusion argument is not limited to these three factors. The *Dreamwerks* Court referred to these factors as "pivotal," and did not preclude consideration of the remaining *Sleekcraft* factors. *Dreamwerks*, 142 F.3d at 1130; *see also Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir.2002) (considering all eight *Sleekcraft* factors in a reverse confusion case); *Glow Indus.*, 252 F.Supp.2d at 986, 987–1004 (noting that three factors are "especially pertinent" in reverse confusion cases, but nonetheless analyzing all eight *Sleekcraft* factors in detail). We begin, however, by considering the three so-called reverse confusion factors.

### 1. Strength of the MATRIX Mark

To determine a mark's strength, it is classified in one of the following four groups, listed in ascending order of strength: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The stronger the mark, the more protection it is afforded. *Sleekcraft*, 599 F.2d at 349. The weaker the mark, the less protection it is afforded. *Id.*

In its Opposition Brief, MMC alleges that "[t]he Matrix mark (name) is arbitrary and deserving of strong protection. The Matrix name does not mean anything or describe anything." (MMC's Opposition Brief, at p. 16). However, MMC's CEO, Mr. Beuzieron, previously testified that "the name [MATRIX] itself means combining technology, which is why I picked it." (Beuzieron Depo., at p. 53).[8]

---

7. MMC's state and common law claims are guided by the same legal analysis as its federal trademark claim. *See* Section IV above, and accompanying text.

8. MMC cannot manufacture disputes of material facts by contradicting itself. *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir.1994); *Web Communications Group, Inc. v. Gateway*

Also, it is common knowledge that the term "matrix" has meanings in the English language. (Toyota's Reply Brief, Draffen Declaration, ¶ 5, and attached Exhibit 4).

The strength of the MATRIX mark is a legal issue. Based on MMC's admissions, this Court finds that MMC intended the mark to be in some way descriptive of its cars. Even if, as MMC argues in its Opposition Brief, MATRIX is arbitrary as applied to cars, this does not mean that it is "deserving of strong protection." (MMC's Opposition Brief, at p. 16). Even "an arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods." *Quality Semiconductor, Inc. v. QLogic Corp.*, 31 U.S.P.Q.2d 1627, 1629 (N.D.Cal.1994) (*citing General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir.1987)); *see also Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509–11 (2d Cir.1997) (although the term "100%" was inherently distinctive for a moisturizer, extensive third-party use of the term for various products, including cosmetics, weakened the strength of the mark); *Glow Indus.*, 252 F.Supp.2d at 990–92 (citing numerous cases where widespread third-party use of a term caused an inherently distinctive mark to be considered weak).

MMC's Opposition Brief identifies thirty third-party uses of "Matrix" outside the automotive or racing fields, which undermines it argument that the term "Matrix" is strong. Toyota presents at least twenty undisputed uses of the MATRIX mark in the automotive field, six of which are in the racing field. Together, this "crowded field" evidence shows that the mark MATRIX is exceedingly weak and diluted, especially in the automotive and automotive racing field, and therefore is entitled to a very limited scope of protection. *Glow Indus.*, 252 F.Supp.2d at 990–92 (finding the mark "GLOW" to be relatively

weak given the exceedingly crowded field of beauty products using the word "glow"); *see also Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988) ("a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."); *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir.1980) (finding that the term ALPHA was weak for steel tubing products because ALPHA was a very common term, and was used in numerous trademarks and tradenames). As the Ninth Circuit has explained:

> In a "crowded field" of similar marks, each member of the crowd is relatively "weak" in its ability to prevent use by others in the crowd. ... In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.

*Miss World (UK) Ltd.*, 856 F.2d at 1449; *see also Nat'l Cable Television Ass'n v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1579 (Fed.Cir.1991) ("Where a mark is commonly used on numerous types of goods and services by different companies ... it may be reasonable to infer in some situations that purchasers have been conditioned to expect different sources for specifically different goods or services even though such goods or services might be deemed sufficiently related to be attributable to a single source under an uncommonly used mark.") The Court finds that the mark MATRIX is commercially weak and diluted, and it thereby entitled only to a narrow scope of protection. *Sleekcraft*, 599 F.2d at 350.

*2000, Inc.*, 889 F.Supp. 316, 319 n. 4 (N.D.Ill.     1995).

## 2. Proximity of the Parties' Goods

Proximity of the parties' goods exists where they are (1) complementary, (2) sold to the same class of purchasers, or (3) are similar in use or function. *Sleekcraft*, 599 F.2d at 350 (citations omitted). Because MMC's race cars and Toyota's passenger cars are neither used nor promoted together, they are not complementary. *Walter v. Mattel, Inc.*, 31 F.Supp.2d 751, 759 (C.D.Cal.1998), *aff'd*, 210 F.3d 1108 (9th Cir.2000).

Additionally, courts have held that the mere fact that "two products or services fall within the same general field ... does not mean that the two products or services are sufficiently similar to create a likelihood of confusion." *Harlem Wizards Entm't Basketball, Inc. v. NBA Props.*, 952 F.Supp. 1084, 1095 (D.N.J.1997). For example, "[t]he fact that both products could broadly be described as relating to music is not sufficient to find that the products have a similar use or function." *Mach. Head v. Dewey Global Holdings, Inc.*, 61 U.S.P.Q.2d 1313, 1318 (N.D.Cal. 2001). "Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category." *Harlem Wizards Entm't Basketball*, 952 F.Supp. at 1095; *see also Sunenblick v. Harrell*, 895 F.Supp. 616, 629 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684 (2d Cir.1996).

MMC's custom-made and specialized racing vehicles sell for between $375,000 to $450,000 to a highly sophisticated niche of consumers. MMC's race cars are custom made, are sold to experts in the racing field.[9] Toyota's inexpensive passenger cars, on the other hand, sell for around $15,000 to $20,000, and the TOYOTA MATRIX cars are mass produced and are directed to passenger car drivers. (Miller Decl. at ¶¶ 2, 4, and 5). MMC admitted that its race cars are sold to different purchasers than the TOYOTA MATRIX cars. (Beuzieron Depo. at 133). MMC did not dispute any of Toyota's evidence or case law showing that the parties' respective goods are not complementary, are not sold to the same class of purchasers, and are not similar in use and function.

For these reasons, MMC's reliance on *Dreamwerks* is misplaced. A Star Trek conventioneer may be likely to assume, mistakenly, that DreamWorks the movie studio produced Dreamwerks' (the senior user's) Star Trek conventions. However, MMC's customers, who are experts in their field, paying hundreds of thousands of dollars for one of MMC's race cars, are unlikely to believe that MMC's cars are made and sold by Toyota. Moreover, MMC presented no evidence of the type that swayed the *Dreamwerks* Court in Dreamwerks' favor. Plaintiff has shown no evidence of ill will when people buy Plaintiff's products, that any people have bought one of Plaintiff's products believing it was a Toyota product (or vice versa), that it has lost or will lose any goodwill due to Defendants' use of the TOYOTA MATRIX mark, that Defendants are likely to make a misstep that damages Plaintiff's reputation (Plaintiff also has presented no evidence of its own reputation), or that **Plaintiff's customers** (who it admits are experts in the racing field) are likely to believe that Plaintiff's cars (which do not even bear the MATRIX mark) are made by Toyota. (See Plaintiff's Brief at 13–16). Finally, the senior user in *Dreamwerks,* unlike MMC, owned a federal trademark registration.[10]

---

9. Beuzieron Depo. at p. 42 and 50.

10. MMC contends that the history of Defendant Toyota Motor Corporation's MATRIX trademark application with the PTO indicates that the parties' respective goods are related. Although the PTO Examining Attorney initially refused registration of Defendant's MATRIX trademark application on the basis that

### 3. Similarity of the Marks

"In judging similarity, trademarks should be considered as they are encountered in the marketplace, taking into account the normal circumstances surrounding purchases of the type of goods they represent." *Glow Indus.*, 252 F.Supp.2d at 994. In addition, marks may not be dissected, but must be compared in their entirety. *Id.*

Here, the proper comparison is between MMC's MATRIX & Design mark and Toyota's TOYOTA MATRIX mark, as that is how the parties use their marks on products. Moreover, "the use of a design as part of a mark minimizes any likelihood of confusion." *Harlem Wizards Entm't Basketball*, 952 F.Supp. at 1096. And the use of a house mark (i.e., the famous TOYOTA mark) also may reduce or eliminate likelihood of confusion. *Cohn*, 281 F.3d at 842 (9th Cir.2002); *see also Walter*, 31 F.Supp.2d at 760 (stating that "[o]therwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer"). Because all Toyota MATRIX vehicles bear the TOYOTA brand name as well as the MATRIX model name, and MMC uses the MATRIX name only with its M Logo, the parties' respective marks are considerably different.

Considering the undisputed evidence, and applying the preceding factors to the reverse-confusion question of whether MMC's customers are likely to believe, mistakenly, that MMC's race cars are made or sold by Defendants, the Court concludes that such confusion is unlikely as a matter of law.

### 4. Remaining *Sleekcraft* Factors

Defendants' Summary Judgment Brief contained discussions regarding the remaining *Sleekcraft* factors (actual confusion, marketing channels, degree of customer care, intent, and likelihood of expansion), but MMC did not address or dispute any of Defendants' arguments, conclusions, or supporting facts, nor did it present evidence of any disputed material facts relating to such factors. MMC's failure to do so is not surprising, given that the remaining *Sleekcraft* factors also militate against a finding of a likelihood of confusion.

#### a. MMC Has Presented No Evidence of Actual Confusion

The Ninth Circuit has held that "lack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Cohn*, 281 F.3d at 843, *quoting Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir.1999).

In its response to Defendants' Interrogatory No. 4, MMC alleged that several people were confused by Defendants' use of the term MATRIX in connection with a passenger vehicle. MMC presented no evidence to substantiate these allegations. MMC's CEO could not provide any further information, such as names of people who were allegedly confused, the dates of any

---

it was likely to cause confusion with another MATRIX application that covered tires for automobiles and trucks, this refusal was subsequently withdrawn, and Defendant's MATRIX application was approved on May 15, 2003. (Toyota's Reply Brief, Draffen Declaration, ¶ 3, and attached Exhibit 2). Moreover, a determination of likelihood of confusion in a registration proceeding is different from such a determination in an infringement action, and the outcomes of the two types of proceedings need not be the same. *Saturn Corp. v. Saturn Tire & Rubber Co.*, No. 89CV73138, 1991 U.S. Dist. LEXIS 14347, *6–7 (E.D.Mich.1991), *aff'd*, 1992 WL 158126, 1992 U.S.App. LEXIS 16651 (6th Cir. July 9, 1992).

inquiries, the nature of the alleged confusion, or any documentary evidence supporting MMC's allegations. (Beuzieron Depo. at p. 83–90). MMC cannot substantiate its claims of actual confusion, which the Court finds to be unreliable and nothing more than inadmissible hearsay. *Avery Dennison Corp. v. Acco Brands, Inc.,* 1999 WL 33117262, at *18 (C.D.Cal. Oct.12, 1999) (declarations regarding comments made by unknown confused third parties and misdirected phone calls were inadmissible hearsay, and the court also noted that there was no identification of the confused people, and there was no reason or explanation as to why they were confused); *Fierberg v. Hyundai Motor Am.,* 1997 WL 715457, 44 U.S.P.Q. 1305, 1306 (C.D.Cal.1997) (letters from sponsors discussing actual confusion of third-parties were inadmissible as double hearsay); and *Alchemy II, Inc. v. Yes! Entertainment Corp.,* 844 F.Supp. 560, 570 (C.D.Cal. Feb.22, 1994) (claims of misdirected phone calls, a declaration regarding third-party comments showing confusion, and a newspaper article referring to defendant's product as a newer "version" of plaintiff's product, were all inadmissible hearsay).

Moreover, none of the people MMC claims were "confused" were, by its own admissions, confused at all between TOYOTA MATRIX passenger cars and MMC's racing cars. (Beuzieron Depo., at 83–90; *see also* Defendants' Reply To Plaintiff's Statement of Genuine Issues in Opposition to Motion For Summary Judgment, namely, Toyota's reply to MMC's statement of claims Nos. 19, 20). In addition to the fact that Mr. Beuzieron's testimony consists of unsubstantiated hearsay, and that MMC could not provide any information about these instances, such as names, dates, nature of confusion, or documentary evidence, this testimony does not evidence any actual confusion about whether MMC made and sold Defendants' vehicles, or vice versa, or whether consumers believed the two entities were somehow related.

█ MMC also claims that some potential customers have refrained from entering into deals with Plaintiff in view of the conflict with Defendants. As noted by this Court, a refusal to do business with a party to a dispute over trademark rights "does not indicate consumer confusion, but business caution in the face of uncertain market competition." *Glow Indus.,* 2002 WL 32057483 at *28.

### b. The Parties Use Different Marketing Channels

Advertising, the existence of direct competition, and retail distribution are considered when addressing whether the parties use similar marketing channels. *See e.g., Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 606 (9th Cir.1987); *Mach. Head,* 61 U.S.P.Q.2d at 1320. A finding that the parties advertise or distribute their products differently indicates a lesser likelihood of confusion. *Id.* (finding defendant's advertisements in entertainment industry trade publications, mailers to advertising agencies, and contacts made by staff dissimilar to plaintiff's marketing its records through radio and print advertising directed at heavy metal fans); *see also Glow Indus.,* 252 F.Supp.2d at 1000 ("some degree of overlap must be present before the factor favors a finding of a likelihood of confusion") (*citing Frehling Enters., Inc. v. Int'l. Select Group,* 192 F.3d 1330, 1339 (11th Cir.1999) (dissimilarities between retail outlets and predominant customers lessen the possibility of confusion, mistake, or deception)).

Defendants advertise the TOYOTA MATRIX vehicle through various media, such as the Internet and television. (Miller Decl. at ¶ 7). Defendants also market the vehicle by showing it at events that attract young car-buyers, such as rock concerts

and extreme sporting competitions. (*Id.* at ¶ 6). Defendants also do not sell the TOYOTA MATRIX vehicle directly to the public. Rather, they use a network of 1,100 TOYOTA dealerships nationwide to distribute the vehicles. (Mudd Report, at p. 6).

In contrast, MMC has provided no evidence of print or television advertising for vehicles in the United States, and it has not distributed any brochures since 1997. (Tamturk Depo. at p. 21–26; Beuzieron Depo. at p. 81; and Kovacs Depo. at p. 39–40). MMC's website does not feature any product bearing the MATRIX & Design mark, and does not allow a visitor to order a product. (Defendant's Summary Judgment Brief, Declaration of Jaclyn Kidwell, at ¶ 4). MMC has offered no evidence of any advertising for race cars. (Response to Defendants' Interrogatory No. 11; Beuzieron Depo. at p. 118).

The custom-made nature of MMC's race cars is also relevant to the analysis of the parties' respective distribution methods. *Mach. Head,* 61 U.S.P.Q.2d at 1320 (defendant's customization of its expensive sound systems versus plaintiff's production of multiple copies of a single audio recording contribute against similarity). By comparison, the TOYOTA MATRIX vehicle is mass-produced.

#### c. Degree of Customer Care

In a reverse confusion case, "the degree of care exercised by customers is determined with reference to the alleged senior user's customers only." *Mach. Head,* 61 U.S.P.Q.2d at 1320. This factor of the analysis clearly favors defendants. Indeed, it is hard to imagine a consumer likely to exercise greater care in his/her purchases than MMC's customers, who are experts in the field of auto racing, and whose lives depend on the ability of MMC's products to perform. Furthermore, the high price of plaintiff's product (about $375,000 to $450,000) requires consumers to be extremely careful. This Court has held that consumers are careful purchasers when considering the purchase of perfume that costs approximately $40/bottle. *Glow Indus.,* 252 F.Supp.2d at 1001–02.

#### d. Defendants' Intent in Adopting the TOYOTA MATRIX Mark

"Generally, in the reverse confusion context, it is not likely that there will be evidence defendant intended to adopt the senior user's mark." *Glow Indus.,* 252 F.Supp.2d at 1002. In the present case, Defendants conducted a full search and investigation prior to adopting the mark. Defendants' search did not reveal MMC's existence. (Lang Declaration, at ¶ 2).

Furthermore, even though Louis Baldwin, a low-level employee for one of Toyota's subsidiaries, knew of MMC's existence,[11] this knowledge cannot be imputed to Toyota as Mr. Baldwin had no involvement in Toyota's selection of the TOYOTA MATRIX trademark. *See Walter,* 31 F.Supp.2d at 761–62. MMC does not contend that Mr. Baldwin was involved in such selection process. (Beuzieron Depo., at 144–45).

MMC argues that Toyota received its cease and desist letter before launching the TOYOTA MATRIX car. Toyota presented undisputed evidence that it believed the TOYOTA MATRIX mark did not infringe any rights owned by MMC, and therefore commenced use of the mark. "[I]nfringement is not willful if the defendant might have reasonably thought that its proposed usage was not barred by the statute." *See SecuraComm Consulting, Inc. v. Securacom Inc.,* 166 F.3d 182, 188

---

11. Lang Decl. at ¶ 3.

(3d Cir.1999), (*quoting Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1300 (9th Cir.1998)). Furthermore, the failure to stop using a mark after receiving a cease and desist letter does not show willful infringement and is "not necessarily indicative of bad faith," particularly where the trademark at issue is not federally registered and the junior user has a reasonable basis to believe that it has a legal right to use the mark at issue. *Secura-Comm Consulting, Inc.* 166 F.3d at 189. Given the stark contrasts between the parties' goods, channels of trade, customers, and weakness of the mark, Defendants had a reasonable basis to believe they had a legal right to use the TOYOTA MATRIX mark.

### e. Neither Party is Likely to Expand into the Other's Existing Market

There can be a finding of infringement under the likelihood of expansion factor only if the junior user uses the mark for the same goods or services into which the senior user had actual plans to expand at the time the junior user began using its trademark. Speculative or unrealistic plans cannot be considered. *See Saturn Corp.*, 1991 U.S. Dist LEXIS 14347, at *13. MMC's undisputed testimony is that MMC's plans to produce a prestige street car are speculative, and Toyota has shown that it does not intend to offer a race car under the MATRIX mark. This Court also finds that MMC's street car would be substantially different from the TOYOTA MATRIX car, and that the parties' respective street cars would be directed to different markets. As such, MMC has not shown that either party intends to expand into the other's existing market.

Moreover, an award of rights based upon a natural zone of expansion "presupposes, however, that the trademark user has already penetrated the market in at least some geographic areas and established a presence there." *Glow Indus.,*

2002 WL 32057483 at *17. The undisputed evidence shows that MMC has no market penetration of prestige passenger cars bearing the MATRIX mark, and has in fact sold no such cars, has no customers for such cars, no investors, and no government approvals for such cars. (Beuzieron Depo., at 26–34, 53).

Simply stated, the remaining *Sleekcraft* factors all favor a finding of no likelihood of confusion.

### C. MMC's Expert Opinions

■ In discussing the summary judgment standard, MMC states that "expert opinion may defeat summary judgment if it appears the expert is competent to give an opinion, the factual basis for the opinion is disclosed, and the expert declaration raises triable issues of fact as to some element of the case." (MMC's Opposition Brief, at 10). While MMC clearly wishes to rely on the declarations of its expert witnesses, Mr. Hibler and Mr. Miller, these declarations do not raise issues of material fact. The ultimate conclusions in these expert declarations contain nothing more than bottom-line opinions that are completely devoid of any foundation, factual basis, reasons, or evidence. For example, Mr. Miller concludes that no major car manufacturer will use one of MMC's engines or bodies due to the existence of the TOYOTA MATRIX car. Nowhere, however, do either MMC or Mr. Miller provide any foundational evidence that any such manufacturers would buy one of MMC's race cars even if the TOYOTA MATRIX car did not exist.

While the expert conclusions contain boilerplate allegations of a likelihood of confusion, they are completely silent on the factual bases for these opinions, and do not discuss the *Sleekcraft* likelihood of confusion factors. Under Ninth Circuit precedent:

Assertions in expert affidavits do not automatically create a genuine issue of material fact ... [w]e are obliged to look at the record to determine whether, in light of any undisputed facts, the inferences to be drawn from the expert's affidavits are reasonable. **"When the expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable," summary judgment is appropriate.**

*Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1440 (9th Cir.1995) (emphasis added and citations omitted). *See also In re Int'l Rectifier Securities Litigation,* No. 91–3357, 1997 WL 529600, at *9 (C.D.Cal. Mar.31, 1997) (same).

MMC cites *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989), yet this case dismissed expert opinion that was nothing more than "rampant speculation," and noted that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process" and "an expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment, for the judge must 'look behind [the expert's] ultimate conclusion ... and analyze the adequacy of its foundation.' " *Id.* (*quoting Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 829–32 (D.C.Cir.1988)). Thus, MMC's expert declarations lack any type of factual basis, and raise no triable issue of fact.

## V. CONCLUSION

Applying either the three so-called reverse confusion factors or the eight *Sleekcraft* factors to the facts and evidence at hand, the Court finds no disputes of material fact and holds as a matter of law that public confusion is unlikely between the parties' respective use of the MATRIX mark. Accordingly, Defendants are entitled to judgment as a matter of law and the Court hereby grants Defendants' motion for summary judgment. The Judgment will be entered forthwith.

**IT IS SO ORDERED.**