**MOOSE CREEK, INC., and Juno Of California, Plaintiffs,**

v.

**ABERCROMBIE & FITCH CO., Abercrombie & Fitch Stores, Inc., and A & F California, L.L.C., Defendants.**

No. CV 04–2894 AHM.

United States District Court, C.D. California.

Aug. 9, 2004.

Pierce O'Donnell, Timothy J. Toohey and Michael D. Murphy of O'Donnell & Shaeffer LLP, Los Angeles, CA, for plaintiffs.

Frank J. Colucci, Richard P. Jacobson, David M. Dahan and Kathleen M. McGann of Colucci & Umans, New York City, and Lynda Zadra–Symes of Knobbe Martens Olson & Bear LLP, Irvine, CA, for defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION.

MATZ, District Judge.

This matter is before the Court on Plaintiffs' motion for a preliminary injunction. For the reasons that follow, the Court denies the motion.

### INTRODUCTION

Plaintiffs are Moose Creek, Inc. and Juno of California. Juno of California ("Juno") is a California partnership, organized in 1975. Its three partners are Wilbur Nussbaum, Norman Kaplan and Richard Bernstein. Since 1989, Juno has operated as a wholesaler, manufacturing and selling a clothing line under the brand name "Moose Creek" to retailers worldwide. In 1989, Juno's Moose Creek clothing line was limited to flannel and denim shirts. By 1991, however, Juno expanded its Moose Creek clothing line to include jackets, shirts, shorts, vests, pants, hats and sweaters.

In 1989, Juno designed and adopted a logo to promote its clothing line and to serve as a source identifier. This logo depicts a realistic-looking moose, over which the words "Moose Creek" are written, and under which the words "Juno of California" are written in slightly smaller font. *Nussbaum Decl., Exh. 2.* As described below, over the years, Plaintiffs have used many variations of this logo.

In 1999, Chris Gang Li, the owner of another clothing manufacturer, began investing in Juno. In 2000, Mr. Li, Mr. Nussbaum and Mr. Bernstein formed and incorporated Moose Creek, Inc., which promoted and sold the Moose Creek brand

of clothing. Juno licensed the rights to all of its trademarks to Moose Creek, Inc.

Since 1989, Plaintiffs have used eight principal logos, in all of which they claim to own a trademark ownership interest:

(1) *The "1994 Mark":* This is the logo that Juno began using in 1989. *Nussbaum Decl., Exh. 2.* On December 3, 1993, Juno filed an application with the Patent and Trademark Office ("PTO") to trademark this logo. On December 20, 1994, the PTO issued a trademark for this logo in class 25 (for clothing, namely jackets, shirts, shorts, vests, pants and sweaters). *Id.* Plaintiffs refer to this trademark as the "1994 Mark." At the end of 2000, Juno cancelled its registration of the 1994 Mark by declining to file an affidavit of use with the PTO, which is required six years after registration of a trademark. According to Plaintiffs, Juno did not intend to abandon the 1994 Mark, but instead believed that the mark was confusing due to its inclusion of the words "Juno of California."

(2) *The "Banner Moose" Mark:* Beginning in 1994 and continuing into the present, Plaintiffs have used the "Banner Moose" mark on labels and hangtags attached to their Moose Creek brand of clothing. *Nussbaum Decl., Exh. 3.* This mark features the words "Moose Creek" in capital red letters within a banner that appears over a picture of a realistic looking moose, which is not shown in a silhouette. Within each of the "o's" in the word "Moose," there is a small dot. The moose appears in front of green grass and a blue lake. Beneath the moose are the words "Legendary Clothing" in capital beige letters. Plaintiffs do not have a federal registration for this mark.

(3) *The "Stretched Oval Moose" Mark:* Beginning in 1995 and continuing into the present, Plaintiffs have affixed the "Stretched Oval Moose" mark to their Moose Creek sportswear line. *Nussbaum Decl., Exh. 4.* This mark features a maroon silhouette of a moose located in a large maroon oval. The word "Moose" appears in capital letters to the left of the moose, and the word "Creek" appears in capital letters to the right of the moose. A dot appears in the center of each of the "o's" in the word "Moose." In smaller maroon capital lettering, the word "Legendary" appears to the left of the moose, and the word "Clothing" appears to the right of the moose. Plaintiffs do not have a federal registration for this mark.

(4) *The "Flag Label Moose" Mark:* Beginning in 1997 and continuing until the present, Plaintiffs have affixed the "Flag Label Moose" mark to small external labels on most garments sold under the Moose Creek brand. *Nussbaum Decl., Exh. 5.* This mark features either one or two small embroidered silhouette moose, superimposed on varying color backgrounds. The external labels protrude from the exterior seam of the garment. The moose appearing on this mark is so small and lacking in detail that it is difficult to tell that the animal portrayed is actually a moose. Plaintiffs do not have a federal registration for this mark.

(5) *The "Built to Last Moose" Mark:* Since 1995, Plaintiffs have affixed the "Built to Last Moose" mark to 95% of their garment hang-tags. *Nussbaum Decl., Exh. 6.* This mark features the words "Moose Creek" and "Legendary Clothing" in yellow letters superimposed on a red background. A dot appears in the center of each of the "o's" in the word "Moose." Below these words, a picture of a moose head (not shown in a silhouette), and the

cursive words "Built to Last" appear on a yellow background, Plaintiffs do not have a federal registration for this mark.

(6) *The "Running Moose" Mark:* Beginning in 2003, Plaintiffs have affixed this mark to the labels on their rugged, heavier weight shirts. *Nussbaum Decl., Exh. 7.* This mark features a yellowish-beige background and a picture of a maroon moose. Above the moose, in maroon capital lettering are the words "Moose Creek." Below the moose are the words "Legendary Clothing," also in maroon lettering. A dot appears in the center of each of the "o's" in the word "Moose." Plaintiffs do not have a federal registration for this mark.

(7) *The "Moose Creek Script" Mark:* Beginning in 2003, Plaintiffs have also used this mark on their clothing labels. *Nussbaum Decl., Exh. 8.* This mark appears on a maroon background. In off-white capital lettering are the words "Moose Creek." A dot appears in the center of each of the "o's" in the word "Moose." Below those words "Moose Creek" are the words "Legendary Clothing," written in off-white script.

(8) *The "2002 Mark":* In 2002, Plaintiffs registered a mark for the stand-alone words "Moose Creek," in class 25 (for clothing, namely jackets, shirts, shorts, vests, pants and sweaters). *Nussbaum Decl., Exh. 11.* This mark depicts the words "Moose Creek" in capital letters. Exhibit 11 does not reveal whether the words or letters were registered for specific colors or backgrounds. Plaintiffs refer to this mark as the "2002 Mark." Although Plaintiffs have not described the ways in which they have used this mark, it appears to be embodied in the "Built to Last Moose"

mark, the "Running Moose" mark and the "Moose Creek Script" mark.

Plaintiffs have sold their Moose Creek brand clothing to over 1000 retail customers in the United States. Most of Plaintiffs' customers are small retail chains (owning 4–50 stores), although a few are large chains (owning more than 50 stores), and several are "mom and pop" shops. Plaintiffs also sell their Moose Creek clothing line to customers through their catalogue, which is published two times each year. *Nussbaum Decl., Exhs. 21–32.* The catalog states that it is for wholesale use only. *Id.* In 2003, Plaintiffs earned $11.5 million in sales revenue from the Moose Creek clothing brand. *Nussbaum Decl. ¶ 23.* According to Scott Nussbaum, a co-owner of and Merchandiser/Designer for Moose Creek, Inc., the end-customers who purchase Moose Creek brand clothing from retailers come from middle and working class families. *Nussbaum Decl. ¶ 32.*

Defendants are Abercrombie & Fitch, Co., Abercrombie & Fitch Stores, Inc., and A & F California, L.L.C. (collectively, "Abercrombie"). Abercrombie is a retailer of men's, women's and children's casual clothing and accessories, including t-shirts, outerwear, sweatshirts, woven shirts, sweaters, jeans, khakis, shorts, sleep wear, underwear, baseball caps and socks. Abercrombie sells its own brand of clothing exclusively through its 500+ retail stores, its catalogues, and on its website, *www.abercrombie.com.* Abercrombie does not sell third-party clothing brands through any of its retail outlets.

In 1998, Abercrombie first offered for sale apparel depicting a moose. Specifically, in its Christmas 1998 catalogue; Abercrombie sold a long sleeve jersey featuring a moose. In mid–2001, Abercrombie decided to begin using a logo depicting a realistic-looking moose, appearing in silhouette form, to represent its brand.

(Hereinafter, the Court will refer to this logo as Abercrombie's "moose logo.") During the Christmas 2001 season, Abercrombie sold boxer shorts and scrub pants bearing its moose logo. In 2002, Abercrombie expanded the line of merchandise bearing its moose logo to include flip-flops, sleep bottoms, briefs and thongs. By July 2003, when the Back–to–School edition of its catalogue arrived in subscribers' homes, Abercrombie had affixed a woven moose logo on the left chest area of its long and short sleeve polo shirts. Later in 2003, Abercrombie further expanded the merchandise line bearing its moose logo to include polo shirts, sweaters, shirts, jerseys, sweatshirts, and women's underwear. In the fall of 2003, Abercrombie also sold a girls zippered, hooded sweatshirt bearing the words "Moose Creek Athl. Dept. Physical Education." *Won Decl.* ¶¶ 3–4.

Between 1998 and February 2004, Abercrombie has earned approximately $207 million in aggregate retail sales revenue from merchandise bearing a moose. *Jeffries Decl.* ¶ 20. In its Fall 2004 clothing line, Abercrombie plans to use its moose logo on 40% of men's tops and 30% of women's tops. *Stevenson Decl.* ¶ 11. Abercrombie predicts that its sales revenue from its moose-bearing merchandise for the 2004 fiscal year will be more than $400 million. *Stevenson Decl.* ¶ 7.

Abercrombie currently owns four federal copyright registrations related to its moose logo, and it has filed six trademark applications, all of which remain pending before the PTO. *Stevenson Decl., Exhs. 1–2.* In three of Abercrombie's trademark applications, the entire moose is depicted in a silhouette, and in the fourth application, only the moose's head is shown, and it is not in a silhouette. *Murphy Decl., Exhs. 11–14.*

Due to Abercrombie's increasing use of a moose logo on its apparel and in its promotional materials, on February 10, 2004, Plaintiffs sent Abercrombie a cease and desist letter demanding that,

> Abercrombie cease and desist from any and all infringement of [Plaintiffs'] trademarks, including, but not limited to, any depiction of the moose or use of the words 'moose,' 'Moose Creek,' or the combination of the word 'moose' and any other word, on any article of clothing, hang-tag and label and in any description of any article of clothing...[or] from any depiction of the moose or use of the word 'moose' in any promotional or advertising materials...immediately destroy every article of clothing depicting a moose or bearing any label or hangtag depicting a moose or containing the words 'moose,' 'Moose Creek,' or any combination of 'moose' with other words, as well as any clothing described using the word 'moose.'...immediately withdraw any and all advertising and promotional materials depicting the moose or utilizing the words 'moose,' 'Moose Creek,' or the combination of the word 'moose' with any other word...[and] withdraw and cancel any trademark application or filing depicting a moose...

*Mossop Decl., Exh. 5.* Upon receipt of this letter, Abercrombie voluntarily discontinued sales of the girls sweatshirt bearing the words "Moose Creek Athl. Dept. Physical Education," but refused to discontinue the use of its moose logo.

As a result of this course of events, on April 26, 2004, Plaintiffs filed suit against Abercrombie. On June 18, 2004, Plaintiffs filed a First Amended Complaint ("FAC") alleging four causes of action: (1) trademark infringement; (2) false designation of origin; (3) unfair competition, in violation of Cal. Bus. & Prof.Code § 17200; and (4) common law unfair competition. The gravamen of Plaintiffs' infringement claim is that Abercrombie's use of the word "moose" and its pictoral depiction of

a moose on its apparel, as well as in its well-financed advertising campaigns, are causing Plaintiffs' customers to confuse Plaintiffs' Moose Creek clothing with Abercrombie's clothing. Plaintiffs are particularly disturbed by Abercrombie's notoriously sexually explicit advertising campaigns, which depict scantily clothed teenagers and a stuffed moose in sexually suggestive positions. *See, e.g., Nussbaum Exhs. 33, 35*, at 111, 113–119. Plaintiffs allege that Abercrombie's actions will likely ruin their good will with their customers, who view Moose Creek, Inc. as a family-oriented company. *FAC* ¶¶ 31–34.

Plaintiffs now move for a preliminary injunction, seeking to enjoin Abercrombie from "using the depiction of a moose, including the word 'moose,' as a trademark, source identifier, or branding device, in interstate commerce throughout the United States." *Proposed Order*, at 2. Abercrombie opposes Plaintiffs' motion. Having considered the parties' arguments, the Court DENIES Plaintiffs' motion.

## ANALYSIS

### A. *The Legal Standard for a Preliminary Injunction.*

■ In order to obtain a preliminary injunction in a trademark case, a plaintiff must demonstrate either: (1) a probability of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and a balance of hardships that tips sharply in its favor. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir.2000). "This analysis creates a continuum: the less certain the district court is of the likelihood of success on the merits, the

more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Southwest Voter Reg. Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.2003); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215 (9th Cir.1987).

In trademark infringement cases, if the plaintiff demonstrates a likelihood of success on the merits (by showing a likelihood of confusion), the Court will presume irreparable injury because trademark damages are, by their very nature, irreparable. "This presumption effectively conflates the dual inquiries of this prong into the single question of whether the plaintiff has shown a likelihood of success on the merits." *GoTo.com*, 202 F.3d at 1205 n. 4 (2000).

### B. *Plaintiffs Are Not Likely to Succeed on the Merits of Their Trademark Infringement Claim.*[1]

■ In order to succeed on a trademark infringement claim involving reverse confusion, the plaintiff must prove that: (1) he is the senior user; (2) of a valid trademark; (3) which the defendant is using in a way that is likely to confuse the plaintiff's customers into believing that they are dealing with the defendant. *Brookfield Comm., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1047, 1053 (9th Cir.1999). Abercrombie does not dispute that Plaintiffs are the senior users of the trademarks in question, but it does challenge whether those trademarks are valid and whether it is using those marks in a way that is likely to cause customer confusion.

---

1. Plaintiffs' motion addresses only their likelihood of success on the merits of their trademark infringement claim. The motion does not address their claims for false designation of origin or unfair competition. The parties agree, however, that if Plaintiffs are likely to succeed on the merits of their infringement claim, then they are also likely to succeed on the merits of their statutory and common law unfair competition claims. *Mot.*, at 13 n. 2; *Opp.*, at 7 n. 5.

### 1. *Plaintiffs' Trademarks Are Likely to be Valid.*

■ Abercrombie contends that Plaintiffs' trademarks are not valid because Plaintiffs have not provided any evidence that the marks have acquired secondary meaning. Trademarks are classified along a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 11:2 (4th ed.2004). Generic marks are not entitled to any protection, and descriptive and suggestive marks are entitled to protection only if the owner of the marks establishes that they have "acquired secondary meaning in the minds of customers, i.e., they have become distinctive of the trademark applicant's goods in commerce." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir.1999). In contrast, marks that are fanciful or arbitrary are "inherently distinctive" and thus are entitled to protection without a showing of secondary meaning. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir.2002). Arbitrary marks are "words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *McCarthy*, supra, § 11:11. Registration of a trademark with the PTO is *prima facie* evidence that the mark is valid and is not generic. *The Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir.1982).

#### a. *The 2002 Mark is Likely to be Valid.*

Because Plaintiffs' 2002 Mark (which depicts the stand-alone words "Moose Creek") is federally registered, it is presumptively valid and non-generic. *Coca–Cola*, 692 F.2d at 1254. Plaintiffs contend that the 2002 Mark is an arbitrary mark because it does not describe or suggest anything about their clothing line. Abercrombie disagrees and argues that "Moose Creek" is a geographic location, and it therefore cannot be an arbitrary mark, but at most merely a descriptive or suggestive mark. In support of this argument, Abercrombie has proffered results from the United States Geological Survey, which indicates that there are 149 geographical locations in the United States called "Moose Creek," including locales, streams and lakes. *Jacobson Decl., Exh. 6.*

■ "It is only when a geographic mark is used as a descriptive term that the law requires proof of secondary meaning." *McCarthy*, supra, § 14:7. A geographic mark is used in a descriptive manner only when it connotes the location or origin of goods sold under the mark. *Id.* § 14:1. Here, Plaintiffs are a California corporation and a California partnership, yet none of the geographic locations called "Moose Creek" (as mentioned in the United States Geographical Survey) is in California. Therefore, it is unlikely that Abercrombie could establish that Plaintiffs use the 2002 Mark to denote the geographic origin of their clothing line. Nor is there any evidence that customers of the parties associate their respective goods with any geographic location. The Court also agrees with Plaintiffs that the words "Moose Creek" do not describe any ingredient, characteristic or quality of Plaintiffs' Moose Creek clothing line. For these reasons, Plaintiffs are likely to succeed in proving that the 2002 Mark, as used by Plaintiffs, is an arbitrary mark for which Plaintiffs need not establish secondary meaning.

#### b. *Plaintiffs' Other Marks are Also Likely to be Valid.*

■ The Court will address together all of Plaintiffs' other marks, in which Plaintiffs may have only common law ownership

rights.[2] These other marks fall into two basic categories: (1) those that contain the words "Moose Creek"; and (2) those that contain only a picture of a moose. The Court finds that Plaintiffs are likely to succeed in proving that all of the marks that contain the words "Moose Creek" (with a dot inside the middle of each "o") are arbitrary marks, regardless of whether those marks also contain a picture of a moose. As discussed above, the use of the words "Moose Creek" do not suggest or describe any characteristic or quality of Plaintiffs' Moose Creek clothing line. Moreover, the placement of a dot inside each letter "o" in the word "moose" gives the word a fanciful quality.

■ The Court also finds that Plaintiffs are likely to succeed in proving that the "Flag Label Moose" mark, which contains a picture of a silhouette moose (without any accompanying wording), is also an arbitrary mark because a moose does not describe any characteristic or quality of Plaintiffs' Moose Creek clothing line. Because Plaintiffs are likely to succeed in proving that their unregistered marks are arbitrary, they do not need to show that the marks have acquired secondary meaning in order to prove that the marks are valid.

### 2. There is No Likelihood of Customer Confusion.

Plaintiffs also contend that Abercrombie's use of the word "moose" in connection with other words (such as "Moose Tees" and "The Moose is Loose"), and its pictoral depiction of a moose on its apparel are confusingly similar to Plaintiffs' own trademarks, which either contain the word "moose," feature a picture of a moose, or both.[3]

"The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield*, 174 F.3d at 1053. In a reverse confusion case, such as this, "[t]he question...is whether consumers doing business with the senior user [Plaintiffs] might mistakenly believe that they are dealing with the junior user [Abercrombie]." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir.1998).

■ Courts in the Ninth Circuit apply the eight-factor *Sleekcraft* test to analyze the likelihood of confusion in trademark infringement cases. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979); *Brookfield*, 174 F.3d at 1053–54. The eight factors are: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the

---

2. The Court need not address the validity of the 1994 Mark because Plaintiffs cancelled that mark at the end of 2000 and do not claim to have used that mark, as it appears in the federal registration, since that time.

3. As mentioned above, in the fall of 2003, Abercrombie sold a girls zippered, hooded sweatshirt bearing the words "Moose Creek Athl. Dept. Physical Education." *Won Decl.,* ¶¶ 3–4. However, immediately after receiving Plaintiffs' cease and desist letter (and before

Plaintiffs filed suit), Abercrombie voluntarily discontinued those sweatshirts. Plaintiffs do not contend that it is likely that Abercrombie intends, or is likely to sell, garments bearing the words "Moose Creek" in the future. Therefore, Plaintiffs' motion for a preliminary injunction, to the extent that it seeks to enjoin Abercrombie from marketing or selling garments bearing the words "Moose Creek," is moot. *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir.1986).

likelihood of expansion of the product lines. *Id.* Although a court must balance all of these factors, in a reverse confusion case, the most important three factors are: (1) the strength of the marks; (2) the similarity of the marks; and (3) the relatedness of the goods. *Dreamwerks*, 142 F.3d at 1130. The Court will analyze each of the *Sleekcraft* factors separately, beginning with the three most important factors.

a. *The Strength of the Marks.*

▮▮ "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark law." *GoTo.com*, 202 F.3d at 1207. In reverse confusion cases, courts evaluate the conceptual strength of the senior user's mark and compare it to the commercial strength of the junior user's mark. *Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 987 n. 112 (C.D.Cal.2002) (Morrow, J.). The conceptual strength of a mark refers to its categorization on the continuum of "genericness" to arbitrariness, with arbitrary marks being entitled to the highest degree of protection from infringement. The commercial strength of a mark refers to its degree of recognition in the minds of the relevant customer class, and it is often measured by the junior user's degree of advertising.

i. *The Conceptual Strength of Plaintiffs' Marks.*

As discussed above, Plaintiffs are likely to succeed in proving that all of their claimed marks are arbitrary and are thus presumptively strong. However, even "an arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods." *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F.Supp.2d 1083, 1091 (C.D.Cal.2003) (Carney, J.) This is known as the "crowded field" doctrine. *See Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988) ("a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive.' It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.")

▮▮ Plaintiffs argue that the dominant feature of all of their marks is either the picture of a moose or the word "moose." Even assuming that Plaintiffs are correct about the dominant features of their marks, Abercrombie has proffered substantial evidence, in the form of internet advertisements, that demonstrates that many retailers are selling clothing bearing either the word "moose" or a picture of a moose very similar in appearance to the moose depicted in Plaintiffs' marks. *Jacobson Decl., Exhs. 1–4.* These retailers include Adirondack Craft, Adirondack Reflections, the Vermont Law School bookstore, Coldwater Creek, Cool as a Moose, the Dartmouth Coop, and Eddie Bauer, among many others.[4] In addition, Aber-

---

4. Plaintiffs object that Abercrombie has not properly authenticated these internet materials, and therefore that the materials are inadmissible. Specifically, Plaintiffs contend that Abercrombie's counsel has "no personal knowledge of who maintains the website[s], who authored the documents, or the accuracy of their contents," and therefore, under Fed. R.Evid. 901(a), counsel cannot authenticate the materials. *See Wady v. Provident Life and Accident Ins. Co. of America*, 216 F.Supp.2d 1060 (C.D.Cal.2002) (Morrow, J.) (excluding internet evidence on a summary judgment motion for these reasons). Rule 901(a) defines a standard of admissibility that is rather general or elastic: the evidence must merely be "sufficient to support a finding that the matter in question is what it proponent claims." Although Plaintiffs are correct that these internet documents are not individually authenticated, the Court finds that at this stage they satisfy Rule 901(a). Moreover, the Court expects that Abercrombie could properly authenticate the materials before trial or summary judgment proceedings. And even if

crombie has proffered to the Court a picture of a moose logo used by Old Navy, another clothing retailer, which is very similar in appearance to the moose depicted in many of Plaintiffs' marks. *Monahan Decl., Exh. 1* (comparing Abercrombie's "moose" boxers with Old Navy's "moose" boxers).[5]

In response to this evidence, Plaintiffs argue that the vast majority of these third-party retailers use a picture of a moose to promote products other than clothing. However, almost all of the internet advertisements submitted by Abercrombie are, in fact, items of clothing, most commonly t-shirts, long-sleeved shirts and sweatshirts. *Id.* Moreover, the exhibit from the Old Navy lawsuit reveals that Old Navy also used a moose on its clothing.

Plaintiffs also argue that the vast majority of these third-party retailers do not use a picture of a moose as a source identifier (*i.e.,* as a trademark), but rather simply use a picture of a moose as an ornamental design.[6] *See McCarthy, supra,* § 3:3 ("To be held liable [for infringement], an alleged infringer must have used the plaintiff's trademarked word, slogan or design as a trademark.") This argument misses the point. Regardless of whether the owners of these clothing companies affix a moose to their clothing line as a trademark or as an ornamental design, the point is that members of the public (who would include Plaintiffs' customers) have likely seen a picture of a realistic-looking moose

on many different brands of clothing, and thus are not likely to associate an Abercrombie product containing a picture of a moose exclusively with Plaintiffs' Moose Creek clothing brand. Therefore, because Plaintiffs' moose operates in a crowded field, to the extent that the dominant feature of Plaintiffs' marks is actually the picture of a moose or the word "moose," those marks are conceptually weak.

ii. *The Commercial Strength of Abercrombie's Marks.*

In contrast to Plaintiffs' conceptually weak marks, Abercrombie's moose logo appears to be commercially robust. Abercrombie promotes its clothing line through its catalogues (which in 2003 had an annual worldwide circulation of 4.75 million), on its website, on in-store photographs, on packaging, and through advertisements in national magazines, such as Rolling Stone, Vanity Fair, Men's Health, Interview, Maxim, Vogue and Elle. *Stevenson Decl.,* ¶¶ 4–5. During the two years between Christmas 2001 to Christmas 2003, Abercrombie spent approximately $9 million to advertise its moose logo. *Id.* ¶ 8. In comparison, over an unspecified number of years, Plaintiffs have spent approximately $1 million on marking and promoting their products, which are not limited to the Moose Creek clothing brand. *Nussbaum Decl.,* ¶ 27.

It may appear somewhat at odds with the prevailing sentiment that commercial

Abercrombie is not actually able to properly authenticate the documents, the fact that pictures of clothing bearing a moose logo are commonly posted on the internet, and that the clothing is purportedly advertised for sale by sellers other than Plaintiffs is still probative evidence that customers may be familiar with clothing bearing a moose logo, which is not sold by Plaintiffs.

5. In October 2003, Aberombie sued Old Navy for Old Navy's allegedly infringing use of this

moose. Although Abercrombie and Old Navy ultimately settled the case, the record does not indicate whether Old Navy continues to use the moose depicted in the exhibit on any of its clothing.

6. Although Plaintiffs stress that this third-party use is merely ornamental, there is no evidence in the record regarding whether these third-party retailers actually use a picture of a moose as an ornamental design or as a source identifier.

"Davids" should not be disadvantaged in their struggle against their "Goliath" competitors, but it is nevertheless true that "[i]n a case of reverse confusion such as this one . . . the senior user's mark is usually weaker than the junior user's." *Glow Industries,* 252 F.Supp.2d at 988. Because Plaintiffs' marks are conceptually weak and Abercrombie's moose logo is commercially strong, then, this factor weighs against confusion. *Glow Industries,* 252 F.Supp.2d at 992 ("Accordingly, while defendants' commercial strength is likely to overwhelm plaintiff in the marketplace to the extent their products compete, the court concludes that [plaintiff] will not likely be able to prove that the strength of the mark factor favors a finding of likelihood of confusion because its own mark is conceptually weak and operates in a crowded field"); *Echo Drain v. Newsted,* 307 F.Supp.2d 1116, 1125 (C.D.Cal.2003) (Walter, J.) (same).

b. *The Proximity or Relatedness of the Goods.*

 Related goods are those "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft,* 599 F.2d at 348 n. 10. In determining whether goods are related, courts consider whether the goods are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use or function. *Matrix Motor Co.,* 290 F.Supp.2d at 1092. "The parties' goods need not be identical or directly competitive, however, for there to be a likelihood of confusion. They need only be related in some manner, or the conditions surrounding their marketing be such that they could be encountered by the same purchaser under circumstances that could give rise to the mistaken belief that the goods come from a common source." *Lockheed Martin,* 43 U.S.P.Q.2d at 1039. Because related goods are more likely than unrelated goods to confuse the public about the source of the goods, the more related the goods, the less evidence of similarity is necessary for a finding of a likelihood of confusion. *Sleekcraft,* 599 F.2d at 350; *Brookfield,* 174 F.3d at 1055.

Here, both parties sell casual clothing, including t-shirts, long-sleeved shirts, pants and jackets. In addition, both parties' clothing is suitable for outdoor activities. Therefore, the parties' clothing is complementary and is similar in use and function. However, the parties do not sell their clothing directly to the same group of customers. Plaintiffs are wholesalers that sell their clothing line only to retail customers. In contrast, Abercrombie is a retailer that sells its clothing line to directly to end-users.

Because the parties' clothing lines are complementary, are similar in use and function, but are not ultimately directed toward the same group of customers, this factor weighs in equipoise.

c. *The Similarity of the Marks.*

 The greater the similarity between two marks, the greater the likelihood of confusion. *GoTo.com,* 202 F.3d at 1206. In determining whether two marks are similar, courts consider their sight, sound and meaning. *Id.* "In analyzing this factor, 'the marks must be considered in their entirety and as they appear in the marketplace.'" *Brookfield,* 174 F.3d at 1054 (citations omitted). According to the "anti-dissection" rule, courts may not dissect marks to examine and compare their component parts. *McCarthy,* supra, § 23:41. Although the court may give greater weight to a dominant feature of a mark (*i.e.,* that which is likely to make a greater impression on an ordinary buyer), in the end the court's analysis must consider and compare the marks in their entirety. *Id.,* supra, §§ 23:41, 23:44. Courts

weigh similarities more heavily than differences. *GoTo.com*, 202 F.3d at 1206.

As discussed above, Plaintiffs claim ownership of approximately eight trademarks that depict either a picture of a moose, the words "Moose Creek," or both. Because many of these marks contain similar features, for ease of analysis, the Court will group Plaintiffs' marks into three categories: (1) marks containing both the words "Moose Creek" and a picture of a moose (the "composite marks"); (2) marks containing only the words "Moose Creek" (the "word marks"); and (3) marks containing only a picture of a moose (the "picture marks").

### i. *Plaintiffs' Composite Marks are Not Similar to Abercrombie's Moose Logo.*

Plaintiffs argue that the picture of the moose is the dominant feature of their composite marks. Plaintiffs further argue that Abercrombie's moose logo, which depicts a silhouette moose, is very similar to the dominant moose in their composite marks, and therefore the two sets of marks are similar in appearance.

This reasoning is analytically flawed for several reasons. First, it violates the anti-dissection rule. Although, as discussed above, a court may consider and give more weight to the dominant features of a mark, in determining whether two marks are similar, the court must compare both marks *in their entirety*. *McCarthy*, supra, §§ 23:41, 23:44. Therefore, although Plaintiffs are correct that Abercrombie's moose logo is somewhat similar in appearance to the picture of the moose contained in some of their composite marks, when comparing the two sets of marks in their entireties, the Court finds that they are very dissimilar. Most importantly, Plaintiffs' composite marks prominently feature the words "Moose Creek." That not only visually differentiates Plaintiffs' composite

marks from Abercrombie's moose logo, but also clearly indicates to purchasers that Plaintiffs, not Abercrombie, are the source of the Moose Creek clothing line. Given that the majority of Plaintiffs' trademarks are composite marks, Plaintiffs' customers are likely to identify Plaintiffs' Moose Creek clothing line by a picture of a moose *and* the words "Moose Creek," not solely by a picture of a moose. This is especially true given that Abercrombie has provided evidence that a substantial number of retailers use a picture of a moose (similar in appearance to Plaintiffs' moose) as either a logo or a decorative design on their clothing.

Second, Plaintiffs' composite marks do not depict the moose in a consistent fashion. In some of the composite marks (such as the "Stretched Oval Moose" mark), the moose appears in a silhouette. In other of the composite marks (such as the "Banner Moose" mark and the "Running Moose" mark) the moose does not appear in a silhouette and is featured in more detail. And in the "Built to Last Moose" mark, only the head of the moose is shown. Due to the variations in the way Plaintiffs depict the moose in their marks, it is unlikely that their customers identify their clothing brand by a silhouette moose (which is the way that Abercrombie's moose logo depicts the moose).

Third, Abercrombie contends (and Plaintiffs do not dispute) that all of Abercrombie's apparel bears its "Abercrombie & Fitch" or "Abercrombie" house marks. Although, depending on the circumstances, a junior user's use of its house mark may either mitigate or aggravate the likelihood of reverse confusion, *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir.1992), given the facts of this case, Abercrombie's use of its house mark will likely mitigate confusion. To the extent that Abercrombie's house mark ap-

pears in a visible location on its clothing, it would likely serve as a further indicator that Abercrombie is the source of its clothing line. Plaintiffs' customers are professional buyers who are presumed to exercise a high degree of care in examining clothing and in making purchasing decisions. *McCarthy,* supra, § 23:101. Given the large number of manufacturers who affix either a picture of a moose or the word "moose" to their clothing (of whose products Plaintiffs' customers are presumably aware), it is not likely that Plaintiffs' customers would see a garment sold in an Abercrombie retail outlet, on which a picture of a moose and an Abercrombie house mark were affixed, and conclude that Abercrombie had formed a commercial relationship (such as a licensing relationship) with Plaintiffs, as opposed to with some other clothing manufacturer who also affixes a moose to its clothing.[7]

Finally, Plaintiffs have not shown that their composite marks and Abercrombie's moose logo are similar in sound and meaning. Abercrombie's moose logo connotes a moose without any other contextual information. Plaintiffs' composite marks, on the other hand, each contain a variety of differing details and words such that none appear to have any consistent meaning; it is difficult to describe in words the "sound" of each mark.

### ii. *Plaintiffs' Word Marks Are Not Similar to Abercrombie's Moose Logo.*

[█] Plaintiffs argue that with respect to their word marks, the word "Moose" is the dominant feature of the mark. Plaintiffs further contend that under the doctrine of picture-word equivalency[8], the word "Moose" is legally equivalent to a picture of a moose. According to Plaintiffs, the logical outcome of this reasoning is that Abercrombie's moose logo (which contains only a picture of a moose) is confusingly similar to their "Moose Creek" word marks.

The Court rejects this argument. Plaintiffs' reasoning is extremely attenuated. There is no basis in the record to find that somehow a picture of a moose and the words "Moose Creek" would actually leave Plaintiffs' sophisticated customers with a similar mental impression and therefore cause them to confuse the parties' clothing lines. Finally, none of the cases Plaintiffs cite to support their reasoning uses this two-step logic (which relies on both the doctrine of dominance and the doctrine of picture-word equivalency). Rather, those cases involve a picture mark that literally portrays the entirety of a word mark. *See, e.g., Mobil Oil,* 818 F.2d at 257 ("We find that the word 'Pegasus' evokes the

---

**7.** Abercrombie also argues that the parties' marks are dissimilar because: (1) Abercrombie's moose has all four legs visible (in contrast to Plaintiffs' moose, whose fourth leg is partially hidden behind its third leg); (2) Abercrombie's moose does not have a beard (in contrast to Plaintiffs' moose, which has a beard); and (3) Abercrombie's moose (in contrast to Plaintiffs' moose) is positioned in such a way that both sets of antlers are visible. The Court rejects these arguments because they focus on very small and insignificant details of the marks that are unlikely to be noticed by, or leave any distinct impression on, an ordinary customer. *GoTo.Com,* 202 F.3d at 1206 ("Quibbles over trivial distinctions between the[ ] two logos are unimpres-

sive.") Moreover, the Court's own comparison of the marks reveals that in the moose contained in both parties' marks, both sets of antlers are visible. *Nussbaum Decl., Exhs.* 2–7.

**8.** The doctrine of picture-word equivalency provides that because a picture mark and a word mark that describes the picture (such as a picture of a moose and the word "moose"), may leave customers with a similar mental impression, a fact finder could determine that the two types of marks are confusingly similar. *McCarthy,* supra, § 23:27; *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 257 (2nd Cir.1987).

symbol of a flying red horse and that the flying horse is associated in the mind with Mobil. In other words, the symbol of the flying horse and its name 'Pegasus' are synonymous.") For these reasons, Plaintiffs' "Moose Creek" word marks are not similar in appearance to Abercrombie's moose logo.

The two sets of marks are dissimilar in sound and meaning. Although the words "moose" and "Moose Creek" sound similar to the extent that they contain an overlapping word, on the whole they sound different because "Moose Creek" contains an additional word (*i.e.*, "Creek"). Moreover, the words "Moose Creek" connote a particular creek, whereas the word "moose" connotes a type of wild animal.

iii. *Plaintiffs' "Flag Label Moose" Mark is Slightly Similar to Abercrombie's Moose Logo.*

 Plaintiffs' "Flag Label Moose" mark is the only one of Plaintiffs' marks that contains solely a picture of a moose, without any accompanying wording. Plaintiffs argue that this mark is similar in appearance to Abercrombie's moose logo because both depict a moose featured in a silhouette. However, at least in the examples of the "Flag Label Moose" mark proffered to the Court, the moose is so small and lacking in detail that it is not readily apparent that the animal depicted is actually a moose, as opposed to a deer, an elk or some other animal. In contrast, it is considerably clearer that the animal depicted in Abercrombie's moose logo is a moose. Because it is not obvious that both marks depict a moose, the marks are only slightly similar in appearance. However, to the extent that Plaintiffs' customers could tell that both marks portray a moose, the marks would be similar in sound and meaning.

In sum, Plaintiffs' composite marks and words marks are dissimilar from Aber-crombie's moose logo. Plaintiffs' picture mark is somewhat similar to Abercrombie's moose logo. Therefore, depending on the particular mark at issue, this factor weighs either against confusion or, only in the case of the picture mark, slightly in favor of confusion.

d. *Overlapping Marketing Channels.*

 When both parties use the same marketing channels to advertise and sell their goods, it exacerbates the potential for confusion. *See Brookfield,* 174 F.3d at 1057. Plaintiffs are wholesalers who sell their Moose Creek clothing line to retail stores, most of which are small chains (owning 4–50 stores), although a few are larger chains (owning more than 50 stores) and a few are "mom-and-pop" stores. Plaintiffs market their Moose Creek clothing line to these retailers through their catalogue, on their website, through their presence at trade shows (including the "Outdoor Retailer Show" and the MAGIC show), through paid advertisements in trade publications and through postcards that they mail to current and prospective retail customers. *Nussbaum Decl.,* ¶¶ 28–31.

Abercrombie is a retailer that advertises and promotes its clothing line and accessories to end-use customers through its catalogues, on its website, through mailings, in its stores, through paid advertisements in popular mainstream magazines, and on its packaging.

Although the parties market their products in many of the same ways, their·marketing efforts are geared toward different customer audiences: Plaintiffs concentrate their advertising efforts on luring retailers, whereas Abercrombie advertises its products only to end-users. Moreover, because Abercrombie sells exclusively its own clothing line in its retail outlets, and it does not sell its clothing line in third-party

retail outlets, a customer would never find Abercrombie's clothing and Plaintiffs' clothing for sale in the same store. *Sleekcraft*, 599 F.2d at 353. Therefore, this factor weighs against confusion.

e. *Evidence of Actual Confusion.*

▉▉] Evidence that customers have actually suffered confusion strongly suggests that the parties' marks are confusingly similar, and that such confusion is likely to recur in the future. *Sleekcraft*, 599 F.2d at 352. Because it is often difficult for a plaintiff to obtain evidence of actual confusion, his failure to proffer such evidence is not dispositive. *Id.,* at 353. Nevertheless, a "lack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Cohn v. Petsmart, Inc.,* 281 F.3d 837, 843 (9th Cir. 2002).

Here, the only evidence of confusion that Plaintiffs have provided is the declaration testimony of Susan O'Wril, who is a professional clothing buyer and is one of Plaintiffs' customers. Ms. O'Wril states in her declaration that in the fall of 2003, while doing competitive shopping at an Abercrombie store, she noticed a collection of men's clothing bearing a moose logo that was similar in appearance to the marks used by Plaintiffs. As a result of seeing this logo on Abercrombie's men's clothing line, Ms. O'Wril "wondered if either Moose Creek was now manufacturing

clothing items for [Abercrombie]; or if [Abercrombie] was now selling Moose Creek clothing." *O'Wril Decl.,* ¶¶ 4–5.[9]

This one instance of confusion, experienced by one of Plaintiffs' 1000 customers during the past three and a half years during which Abercrombie has used a moose logo on its clothing, is very weak evidence of confusion. Plaintiffs have not provided any survey data suggesting that confusion is occurring on a broader scale, nor have they provided evidence that they have experienced a decrease in sales revenue due to the occurrence of such confusion. To the contrary, according to the declaration testimony of one of Moose Creek Inc.'s co-owners, Plaintiffs' sales revenue from their Moose Creek clothing line has grown substantially in the past few years, from $6.5 million in 2002 to almost $11.5 million in 2003, *Nussbaum Decl.,* ¶ 24. Under these circumstances, Plaintiffs' failure to provide the Court with more probative evidence of confusion suggests that such confusion has not, and is not likely to occur in any substantial manner. *See Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601 (9th Cir.1987) (in light of both parties' high volume of business, several instances of actual confusion were de minimis); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 284 (6th Cir. 1997) ("isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likeli-

9. Abercrombie argues that Ms. O'Wril's testimony is not relevant evidence of actual confusion because her confusion did not ultimately affect her purchasing decisions. In support of this proposition, Abercrombie cites *Walter v. Mattel, Inc.,* 31 F.Supp.2d 751, 758 (C.D.Cal.1998), which quotes the following passage from the Restatement of Unfair Competition: "Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." Aber-

crombie cites the Restatement out of context and in a misleading way. It is well established that confusion among purchasers or potential purchasers who pay attention to brands in a particular market is actionable, even if that confusion does not ultimately lead to a purchase. *McCarthy,* supra, § 23:5. An example of such actionable confusion is initial interest confusion. *Id.,* § 23:6; *Brookfield,* 174 F.3d at 1062–64.

hood of confusion and may even suggest the opposite.") Therefore, this factor weighs only very slightly in favor of confusion.

### f. The Degree of Care Likely to be Exercised by Purchasers.

■■■ When goods are expensive, buyers can be expected to exercise greater care in their purchases, and therefore confusion as to the source of the goods is less likely to occur. *Sleekcraft*, 599 F.2d at 353. Moreover, when the relevant customers are professional buyers, they are less likely to be confused by similar marks than are ordinary customers. *McCarthy*, supra, § 23:101 ("... where the relevant customer class is composed of professionals familiar with the field, they are sophisticated enough not to be confused by trademarks that are closely similar.") In reverse confusion cases, courts address the degree of care likely to be exercised by only the senior user's customers. *Matrix Motor*, 290 F.Supp.2d at 1095.

This factor clearly favor Abercrombie. Plaintiffs' customers are professional commercial clothing buyers, and they are therefore likely to be familiar with the retail clothing market, likely to exercise a high degree of care in selecting wholesale clothing to purchase, and thus unlikely to be easily confused by both parties' use of a moose on their marks.

### g. Abercrombie's Intent in Selecting its Moose Logo.

■■■] "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. However, this factor is of minimal importance and there is no requirement that the defendant actually

intend to confuse customers. *GoTo.com*, 202 F.3d at 1208. "Generally, in the reverse confusion context, it is not likely that there will be evidence [that the] defendant intended to adopt the senior user's mark." *Matrix Motor*, 290 F.Supp.2d at 1095.

Plaintiffs argue that Abercrombie adopted its moose logo knowing that Plaintiffs used a similar logo, and thus that Abercrombie acted in bad faith. In so arguing, Plaintiffs refer to a 1998 lawsuit, in which Abercrombie sued Plaintiffs in an unrelated matter. As part of the settlement of that lawsuit, between January 1999 and January 2000, Plaintiffs provided Abercrombie's outside counsel with copies of three issues of their Moose Creek catalogue, in which clothing bearing their trademarks was displayed.

In response, Abercrombie argues that Tom Ward, its Art Director, developed its moose logo independently in 2001 and that there is no reasonable basis to impute the knowledge of Abercrombie's outside counsel to Mr. Ward. *Ward Decl.* ¶¶ 2–6, 10. Abercrombie also contends that after Mr. Ward designed its moose logo, in December of 2001, its outside counsel conducted a design search of PTO records to determine whether anyone else owned trademark rights in a similar logo. *Mossop Decl.*, ¶ 6–9. The search revealed Plaintiffs' 1994 Mark, which Plaintiffs had cancelled. After reviewing the results of the search, Abercrombie's outside counsel advised Abercrombie that its moose logo was not similar to any other designs for which trademark registrations had been issued or for which trademark applications had been filed. *Id.*, ¶ 9.

In the absence of any evidence that Abercrombie's counsel told Mr. Ward about the marks featured in Plaintiffs' 1999 catalogues or forwarded those catalogues to him, the Court will not impute the knowledge of Abercrombie's counsel to Mr. Ward.[10] Therefore, there is no proba-

---

10. Plaintiffs do not contend that the Aber- crombie attorneys who reviewed Plaintiffs

tive evidence that Abercrombie acted with a bad faith intent when it adopted its moose logo. Accordingly, this factor weighs against confusion.

### h. The Likelihood of Expansion of the Parties' Product Lines.

"A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft,* 599 F.2d at 354. When the two companies already compete to a significant extent, this factor is of minimal importance. *See Brookfield,* 174 F.3d at 1060.

Neither party has argued or proffered evidence either that Plaintiffs are planning to expand to sell their Moose Creek clothing line directly in the retail market, or that Abercrombie is planning to expand to sell its clothing line in the wholesale market. Therefore, this factor weighs against confusion.

### CONCLUSION

██ Upon weighing the *Sleekcraft* factors, the Court finds that the majority weigh against a likelihood of customer confusion: Plaintiffs' marks are conceptually weak, the majority of the parties' marks are dissimilar, there is very little evidence of actual confusion, Plaintiffs' customers are sophisticated, there is no probative

evidence that Abercrombie acted in bad faith when it designed and adopted its moose logo, and the parties are not likely to expand their product lines to compete more directly with each other. The only factors weighing in favor of confusion are that one of Plaintiffs' eight trademarks is somewhat similar to Abercrombie's moose logo, and that one of Plaintiffs' customers has experienced actual confusion. The final factor— the relatedness of the goods— weighs in equipoise. Because most of the factors weigh against confusion, and only two weigh slightly in favor of confusion, Plaintiffs have not established either a likelihood of success on their trademark infringement claim, or even the existence of serious questions going to the merits of that claim.[11]

For all of these reasons, Plaintiffs' motion for a preliminary injunction is DENIED.[12]

IT IS SO ORDERED.

---

catalogues in 1999 and early 2000 were the same attorneys who conducted the PTO search in late 2001 and who advised Abercrombie that no similar designs had been registered with the PTO (and therefore that it was safe for Abercrombie to adopt its moose logo). Nor do Plaintiffs argue that at some point in time between 1999 and 2001, the two sets of attorneys communicated about the content of Plaintiffs' catalogues.

11. Because Plaintiffs have not established either a likelihood of success, or even serious questions going to the merits of their trademark infringement claim, the Court need not address whether Plaintiffs will suffer irrepara-

ble injury in the absence of a preliminary injunction, the balance of hardships, or whether Plaintiffs' infringement claim is barred by the doctrine of laches. As to the irreparable injury prong, the Court notes, however, that Plaintiffs' ever-increasing sales revenue suggests that they have not been harmed by Abercrombie's conduct. Moreover, Abercrombie has recently discontinued *A & F Quarterly,* its sexually suggestive catalogue. *Nussbaum Decl.* ¶ 35. This further reduces the likelihood that Abercrombie's conduct will irreparably injure Plaintiffs in the future.

12. Docket number 11.